ADOLPH COORS COMPANY, a Corporation of Colorado, Plaintiff,

v.

A. GENDERSON & SONS, INC., a Corporation of Maryland, Defendant.

Civ. A. No. 76–K–1082.

United States District Court,
D. Colorado.

March 5, 1980.

Leo N. Bradley, Golden, Colo., Bruce G. Klaas, Denver, Colo., for plaintiff.

Robert B. Keating, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

This is an action for statutory and common law trademark infringement and unfair competition. Plaintiff seeks relief in the nature of a permanent injunction and an order of this court requiring destruction of all Coors beer, containers and packaging in the possession of or under the control of defendant. The parties have stipulated to the following facts:

1. Adolph Coors Company is a Colorado corporation having its principal place of business in Golden, Colorado.

2. A. Genderson & Sons, Inc., is a Maryland corporation authorized to do business in the State of Colorado, and at all times herein held a valid Federal Basic Permit as a beer wholesaler, as well as other licenses authorizing it to do business.

3. This is an action under the United States Trademark Act of 1946, the Lanham Act, 15 U.S.C.S. § 1051, *et seq.* for trademark infringement with a request for injunctive relief, the Court having jurisdiction under 15 U.S.C.S. § 1121 and 28 U.S.C.S. § 1338(a) and under C.R.S.1973, §§ 7–9–119, 13–1–124, 13–1–125, and related causes of action.

4. Adolph Coors Company is the owner of United States Trademark Registration Nos. 519,209, 654,932 and 671,933. (references omitted). The Company now uses and for long periods of time prior to the issuance of the registration set forth in paragraph 3 has used the trademarks protected by said registrations in connection with the distribution and sale of Coors beer and is the owner and beneficiary of all the goodwill associated with the trademarks of those registrations.

5. Coors beer is manufactured by Adolph Coors Company at its only brewery located in Golden, Colorado. The beer is sold in the states of Arizona, California, Colorado, Idaho, Iowa, Kansas, Missouri, Montana, Nebraska, Nevada, New Mexico, Oklahoma, Texas, Utah, Washington and Wyoming through distributors authorized by the Company, all of whom follow quality control procedures established by the Company. Coors beer is sold in containers and packages having Adolph Coors Company trademarks and trade name thereon. These trademarks and trade name are well known by purchasers and potential purchasers throughout the United States who uniquely associate the trademarks and trade name of beer manufactured, distributed and sold by Adolph Coors Company.

6. Adolph Coors Company has advertised its beer in all types of media and various articles. As a result, people throughout the United States are familiar with the trademarks and trade name of Coors and with Coors beer. These persons throughout the United States, as a result of distribution of Coors beer in the 16-state marketing area set forth in paragraph 5 have had occasion to purchase and consume Coors beer and are familiar with the trademark Coors. A high level of goodwill among purchasers of beer throughout the United States has been developed, and that goodwill is associated with the trademark of Coors.

7. Adolph Coors Company, through no fault of its own and for good business reasons, has been unable to manufacture sufficient quantities of Coors beer to meet the public demand throughout the United States of America. The Company manufactures and distributes this beer, which is not heat pasteurized, in accordance with certain high quality standards designed to obtain, maintain and preserve a uniquely high quality beer product and to assure the availability of high quality beer to the purchasers of Coors beer.

8. (Reference omitted). Additionally, the time limit imposed by Coors on its distributors is that no beer should remain in retail stores after 60 days from packaging, and, to this end, the cartons and cases are stamped with abbreviated month, day, and hour being the maximum time that the beer may be made available to the public. Each distributor is required to remove, at its cost,

beer bearing dates exceeding 60 days from the retailer's store and is required to destroy the same. No requirements are imposed by Coors upon the retail store regarding manner of storage, either with or without refrigeration, although they are encouraged to refrigerate, if lawful, by Coors. No instructions are placed on the Coors cans, bottles, cartons or packs advising the consumer to refrigerate the product.

9. Coors beer is a relatively delicate perishable product subject to flavor deterioration if stored for lengthy periods without proper refrigeration, and for this reason distributors of Coors ship from the brewery in refrigerated or insulated carriers and limit the time of sale after storage in refrigerated warehouses and delivery in refrigerated or insulated delivery trucks. The system of manufacturing and distributing of Coors beer is known throughout the United States by beer distributors and retailers. The general public recognizes the high quality of Coors beer and the trademark Coors is uniquely associated throughout the United States with Adolph Coors Company and its extraordinary high quality standards of manufacturing. The public has no way to determine the quality of Coors beer by inspection at the time of purchase and, therefore, must rely on the reputation of Coors beer for high quality.

10. On repeated occasions during the last several years, Genderson has purchased large quantities of Coors beer from licensed retailers in the State of Colorado and other states, upon the payment of retail prices and applicable taxes, for the purpose of transporting the same to Maryland and other states close by for sale to retailers and other distributors in those areas. Genderson did not deliberately alter or change the original package, case, carton, can, bottle or the beer contained therein and made no changes in the identifying trademarks on the product or packages. Transportation, storage and sale of the beer by Genderson has been done without making any effort to maintain the quality control standards of Coors. Genderson and its customers have used the trademark of Coors in connection with the distribution and sale of Coors beer without authorization of Adolph Coors Company.

11. Genderson, at no time, represented to third persons that he and his company were in fact authorized distributors of Adolph Coors Company. Genderson did place an ad in the yellow pages of the telephone book stating that Genderson & Sons were wholesale distributors of beer, and then listing the brand name of said beer, including the name, Coors. (Reference omitted). Genderson did distribute to retailers to place in their windows signs saying "Coors is here". (Reference omitted). The Genderson warehouse does not display any Coors signs, and the delivery trucks of Genderson do not display the name, Coors.

12. Some of Genderson's customers, namely retail package stores and other beer wholesalers, may have known that Genderson was not an authorized distributor of Coors, in that Coors, on April 18, 1977, sent a letter to retailers in the Washington, D.C. area, advising them of an ad that was going to be placed in the Washington, D.C. paper and furnishing them with a copy of said ad. (Reference omitted.) Some of the consumers purchasing Coors from retailers, as a result of the ad and other sources, may have known that Washington, D.C. and the state of Maryland were not in the regular Coors market and distribution area.

13. The distribution and sale of Coors beer by Genderson and its customers over long periods of time absent refrigeration has caused a loss of the high quality and freshness of Coors beer as it has been manufactured, resulting in the sale to the public of Coors beer in an unfit condition and inferior quality, all of which severely damages the good reputation of Coors beer and causes a loss of goodwill of Adolph Coors Company because of the beer being held in disrepute by purchasers of Coors beer in this condition. Genderson, all during its operations as set forth herein, has had knowledge of the high quality standards maintained by Adolph Coors Company for its beer. The Coors beer being so distribut-

ed and sold by Genderson and its customers is in the original containers so as to be identical in appearance to the Coors beer distributed and sold by Adolph Coors Company and its authorized distributors, so the public has no means of distinguishing between the two. In the distribution and sale of Coors beer in this manner there exists the potential effect of diverting trade from the Adolph Coors Company to its competitors, causing Coors beer to be held in disrepute resulting in a loss of goodwill and irreparable damage and also has the potential effect of subjecting Adolph Coors Company to product liability type claims for damages.

14. Genderson's use of the trademark Coors constitutes a representation that the beer distributed and sold by Genderson and its customers has been subjected to the same high quality and freshness standards ordinarily specified by Coors and is of the same high quality and freshness as the beer distributed by authorized distributors and sold by retailers receiving Coors beer directly from authorized distributors.

15. Coors is now using and has for a long time prior to the acts of Genderson used the trade name Adolph Coors Company on all containers and packaging for Coors beer manufactured and distributed by Adolph Coors Company.

16. The Adolph Coors Company has obtained and owns State of Colorado Trademark Registration No. T12938 (Reference omitted). Genderson has made arrangements in the State of Colorado to acquire and has in fact acquired large quantities of Coors beer in the State of Colorado for transportation and distribution in other states by Genderson and has used Coors trademark without the consent of Coors on containers and packaging manufactured by Coors in the State of Colorado in a manner likely to cause confusion, mistake or deceptions to the source of origin of Coors beer.

17. Genderson has and intends to continue distributing and selling Coors beer which, due to its acts or omission of acts, has been or may be damaged or deteriorated and may vary from Coors' standards of quality. Deterioration has been caused because of the lack of proper refrigeration and the passage of unreasonably long periods of time between the date of manufacture and the date of sale to the ultimate consumer. All of this is beyond the control of Coors.

18. The loss or deterioration of the ordinary high quality Coors beer distributed and sold by Genderson is likely to adversely affect the goodwill of the Adolph Coors Company and cause irreparable harm and damage to the Adolph Coors Company's reputation for high quality beer.

19. The trademark Coors symbolizes Adolph Coors Company's goodwill and reputation for high quality beer and the goodwill and reputation dependent upon the character and condition of Coors beer sold to the public. Public purchasers rely on the trademark Coors as an indication of high quality and will hold Adolph Coors Company responsible for any loss of high quality resulting from the distribution and sale of Coors beer by Genderson.

20. Any adverse consequences of Genderson's use of Adolph Coors Company trademarks and trade name in connection with the distribution and sale of Coors beer by it and its customers is likely to injure the business reputation of Adolph Coors Company and is likely to dilute the distinctive quality of Adolph Coors Company trademarks and trade name.

*Trademark Infringement*

Plaintiff's claim for trademark infringement is based upon the Lanham Act, specifically 15 U.S.C. § 1114(1)(a), C.R.S. 7–70–111 and common law trademark infringement. § 1114 provides in pertinent part:

1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause, mistake, or to deceive; . . . shall be

liable in a civil action by the registrant for the remedies hereinafter provided. Defendant contends that its conduct did not constitute trademark infringement because it has not reproduced, counterfeited, copied or imitated the plaintiff's trademark.

However, § 1114 has not been construed as narrowly as defendant suggests. Although defendant's conduct does not literally involve reproduction, counterfeit, copy or colorable imitation of a trademark, it nevertheless falls within the scope of § 1114. As plaintiff asserts, § 1114 has been liberally construed to prevent misappropriation of the goodwill of the owner of a trademark; the act forbids misappropriation which will adversely influence the owner and the public.

Trademarks serve more than a singular function.

Although the primary purpose of a trademark is to indicate the origin, manufacture and ownership of the article in the mind of the purchasing public, it is usually associated with the quality of the product which it symbolizes. . . .

*Avrick v. Rockmont Envelope Co.*, 155 F.2d 568, 571–572 (10th Cir. 1946). The acts of defendant in this controversy pose a threat to the quality assurance function of trademarks. This is clearly shown by the stipulated facts of this case.

The distribution and sale of Coors beer by Genderson and its customers over long periods of time absent refrigeration has caused a loss of the high quality and freshness of Coors beer as it has been manufactured, resulting in the sale to the public of Coors beer in an unfit condition and inferior quality, all of which severely damages the good reputation of Coors beer and causes a loss of goodwill of Adolph Coors Company because of the beer being held in disrepute by purchasers of Coors beer in this condition.

(Stipulated Fact ¶ 13, supra p. 133).

The instant case is similar in nature to cases which have involved the resale of goods of inferior quality or of altered condition but which continued to bear the original trademark. In *J. C. Penney Co. v. Charbeth's Little General Store*, 185 U.S. P.Q. 254 (E.D.N.Y.1975), defendant acquired and sold Penney's merchandise that was several years old, discontinued and/or out of style. The merchandise bore the original Penney's trademark and was sold to the public as first quality merchandise. As is true of the instant case, defendant did nothing to alter deliberately or change the merchandise. Nonetheless, the court concluded that defendant's acts constituted statutory and common law trademark infringement.

Likewise in *J. C. Penney Company v. Parrish Co.*, 339 F.Supp. 726 (D.Idaho 1972)[1], defendant sold Penney's merchandise without removing plaintiff's trademarks or trade names. The Penney's merchandise sold and displayed was damaged, out of style or defective in quality. The court held that such acts constituted trademark infringement in violation of 15 U.S.C. § 1114 and the use of a false description or representation in violation of 15 U.S.C. § 1125(a). In reaching this determination the court found:

The advertising, display and/or sale by defendant of merchandise bearing plaintiff's trade names and/or trademarks is likely to cause confusion or misunderstanding as to the source, sponsorship, approval or certification of the merchandise so advertised, displayed or sold. The advertising, display and/or sale by defendant of merchandise bearing plaintiff's trade names and/or trademarks is likely to cause confusion or misunderstanding as to defendant's affiliation, connection, or association with, or certification by plaintiff. The aforesaid acts of defendant create the likelihood of injury to plaintiff's business reputation and of the dilution of the distinctive quality of plaintiff's trade names and trademarks.

At p. 727. See Also, *Paddington Corp. v. Major Brands, Inc.*, 359 F.Supp. 1244 (W.D. Okl.1973).

---

1: See also, *J. C. Penney Company v. Parrish Co.*, 335 F.Supp. 209 (D.Idaho 1971).

It is well settled that the right of a purchaser to resale a product is limited. It was clearly stated in *Green v. Electric Vacuum Cleaner Co.*, 132 F.2d 312 (6th Cir. 1942) that:

> . . . the purchaser of goods does not acquire ownership of the trade-mark attaching to them, and he cannot sell such goods after he has changed or altered them, so that they no longer represent the original character and excellence which the trade-mark indicates, and to sell such altered goods without removing the original trade-mark, is infringement.

At p. 314. See *Prestonettes Inc. v. Coty*, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924); *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947). Although, in the present action, defendant did nothing deliberately to alter the beer, the fact that defendant distributed and sold Coors beer has resulted in the beer no longer representing the original character and excellence indicated by the Coors trademark.

Here, defendant is engaged in reselling a product of inferior quality. Defendant's acts are likely to affect adversely the goodwill of Coors and cause irreparable harm and damage to Coors' reputation for high quality beer, (Stipulated Fact ¶ 18, supra p. 134) and likely to dilute the distinctive quality of Adolph Coors Company trademarks and trade name. (Stipulated Fact ¶ 20, supra p. 134).

Defendant cannot continue to use the Coors trademark in a way that confuses the public and deceives the public into purchasing beer of inferior quality. Nor can defendant use the Coors trademark in a way that is likely to damage the goodwill and business reputation of Coors. As indicated, defendant's right to resell Coors beer is not unlimited. For the foregoing reasons, defendant's conduct constitutes statutory trademark infringement in violation of 15 U.S.C. § 1114, C.R.S. 7–70–111, and common law trademark infringement. Defendant's conduct also violates 15 U.S.C. § 1125(a).

## Unfair Competition

Defendant claims that its conduct did not constitute unfair competition since it did not palm off its product as that of the plaintiff. The doctrine of unfair competition is no longer limited to situations involving palming off. See, *Big O Tire Dealers v. Goodyear Tire & Rubber Co.*, 10 Cir., 561 F.2d 1365 (1977). In Colorado the trend is to extend the policy of protecting established trade names and trademarks. Also in Colorado, what conduct constitutes unfair competition is a question of fact; no inflexible rules govern the applicability of the doctrine. The most important consideration is whether defendant's conduct will confuse or deceive the public. *Swart v. Mid-Continent Refrigerator Co.*, 145 Colo. 600, 360 P.2d 440 (1961); *United States Bank of Grand Junction v. Mesa United Bank of Grand Junction*, Colo.App., 595 P.2d 259 (1979); *Wood v. Wood Homes, Inc.*, 33 Colo.App. 285, 519 P.2d 1212 (1974).

Defendant's acts constitute unfair competition. As has already been mentioned, the beer sold by defendant was of inferior quality. Also, as pointed out by plaintiff, defendant has acted in total disregard of the distribution and quality maintenance standards of Coors. Furthermore, customers are likely to be confused and will hold Coors responsible for any loss of high quality resulting from defendant's acts. This conduct adversely affects plaintiff. Support for this conclusion is found in *Clairol Inc. v. Sarann Co.*, 146 U.S.P.Q. 726 (Pa.Com.Pl.1965) where the court stated:

> . . . [T]he consumer will attribute any unsatisfactory performance . . . to plaintiff and not to defendant. Defendant thus uses plaintiff's goodwill to make sales but acts in a manner which can only decrease plaintiff's goodwill, thus damaging an important property interest of plaintiff. It would seem, therefore, that plaintiff is entitled to protection from these acts of defendant.

At p. 730. The court in *Clairol* also found that unfair competition encompassed the acts of selling an article of inferior quality identified with the manufacturer's trademark.

In the instant case not only did defendant's conduct damage an important property interest of plaintiff, it also operated as a fraud and a deception upon the public. The public is deceived when one person sells an inferior product of another as the other's superior product. Such conduct which tends to injure the reputation and goodwill of plaintiff constitutes unfair competition. *Clairol, Inc. v. Boston Discount Center of Berkeley, Inc.*, 608 F.2d 1114, 204 U.S.P.Q. 89 (6th Cir. 1979). In the present action defendant's conduct is likely to confuse and deceive the public and damage plaintiff's reputation. The public interest is an important one which deserves protection—especially when it comes to matters so dear to the hearts of discriminating connoisseurs of civilization's oldest refreshment. Accordingly,

IT IS ORDERED that defendant is permanently enjoined from the unauthorized distribution and sale of Coors beer.

IT IS FURTHER ORDERED that all Coors beer, containers and packaging in the possession of or under the control of defendant be destroyed. Defendant shall bear the costs of this action.